## 57446. STRICKLIN v. THE STATE.

BIRDSONG, Judge.

Defendant was indicted for six counts of theft by taking of money. A jury found him guilty on five of the counts. He has appealed, raising only the issue of whether the evidence authorized the findings of guilty.

Count 1 charges the theft of $556.58, the property of Ricky A. Greer. Mrs. Helen Greeson testified that on May 14, 1977, she called on defendant to obtain automobile insurance covering the automobile of her son, Ricky A. Greer. Defendant was an insurance agent. She testified that she gave defendant, on behalf of her son, $307 as a down payment on the premium; that the total premium was $794; that the balance was to be financed for six months at $81.17 per month through the Acceptance Premium Company; and that all payments were made to the latter. The Greer insurance application was rejected by the company to which it was first tendered. Thereafter, insurance was obtained on the vehicle from Allstate through the state assigned risk plan. The policy was issued, however, at an annual premium of $977. Later two cancellation notices for non-payment of premium were received by Greer from Allstate. One notice reflected that Greer's insurance would be canceled on September 6, 1977, and the amount past due was $295. Greer issued his check in this amount to Allstate on August 31, 1977. The second cancellation notice was effective on November 9, 1977, and the amount past due was $357. Mrs. Greeson paid Allstate this amount by check for her son on that date. Mrs. Greeson, on cross examination, testified that she paid defendant only the original $307 payment in May, 1977.

Count 2 charged the defendant with theft of $286.52,

being the property of Bessie Bunkley. Bessie Bunkley testified that in May, 1977, she contacted defendant to obtain auto insurance. She made a down payment on the premium of $200. The balance of the premium was financed with six payments of $53.40 per month through Acceptance Premium Company. All six payments were made by Mrs. Bunkley to the finance company. The insurance was initially obtained for her from Government Employees Insurance Company. In August, 1977, she received a cancellation notice from this company which reflected that her policy would be canceled for non-payment of premium on August 25, 1977. This notice also reflected: "Total Balance Outstanding, $202.32"; "Amount overdue N/A"; "Current Instalment Due N/A"; and "Amount Payable Minimum Premium Due $ N/A . . . Total Balance Due N/A." In October, 1977, she was insured by another company, American Liberty Insurance Company. In the latter part of November, 1977, she received a notice of cancellation from American Liberty. She then obtained coverage with another company in December, 1977. Later she received a refund check of $83.28 from Acceptance Premium Company. Mrs. Bunkley paid defendant only the original $200 down payment.

In Count 4, defendant was charged with stealing $97, the property of Charles Florence. In June, 1977, Florence went to defendant's insurance agency to purchase auto insurance and paid defendant $97 as a down payment. Later, he received a letter from an insurance company stating that he was not insured because the company would not accept defendant's check. He later contacted defendant sometime in 1978 who refunded $80 to Florence. At a later date, defendant refunded an additional $10.

Count 5 charged defendant with the theft of $93.49, property of Jimmy Camp. Camp testified that in July, 1977, he purchased automobile insurance through the defendant. Camp paid $123 as a down payment and arranged to finance the balance of the premium in six equal monthly instalments of $33.73 per month with the Mid Town Installment Service. Camp made three payments of $33.73. In September, 1977, he received a

cancellation notice from his insurance company for non-payment of a $91 premium due.

Later he commenced sending his payments directly to his insurance company. At some other point in time, he received a $90 refund from the company and a $30 refund from the defendant.

In Count 6, defendant was accused of the theft by taking of $214.03 property of Lawrence Greene. Greene testified that in June, 1977, he purchased auto insurance through defendant's agency, paying $250 down and $28.21 per month for six months. According to Greene, he received no policy. He received $4 as a refund.

### Count 1

Defendant testifying in his own behalf stated that in the Greer transaction all money that he received was in fact paid to Allstate and Greer's policy was never canceled. This was unrefuted.

### Count 2

Defendant obtained insurance for Mrs. Bunkley originally with Government Employees Insurance Company and he remitted $448.20 to this company, with money paid to him by Mrs. Bunkley and the finance company. Government Employees rated the policy at a higher premium than defendant and this company wanted an additional premium; the premium was not paid in time and the policy was canceled on August 25, 1977. Government Employees refused to reinstate as Mrs. Bunkley was on the assigned risk plan, it appearing that once Government Employees obtains the opportunity it will cancel an assigned risk policy. Defendant then purchased another policy for Mrs. Bunkley with American Liberty Insurance Company and advanced $158.80 out of his own funds to the latter in payment of the premium on behalf of Mrs. Bunkley. The difference between this amount and the $200 down payment constituted defendant's commission. In December, the second policy was canceled for non-payment of premium. According to defendant, the $83 refund given to Mrs. Bunkley was originally sent to him by Acceptance Premium Company; that he did not know "which company" remitted the refund to Acceptance. Government Employees did not send any refund of any un-

earned premium to defendant.

*Count 4*

Defendant admitted that the Florence application which was processed under the assigned risk plan was rejected by the insurance company unless he furnished a cashier's check; that he did not re-submit with this type of commercial paper as "Mr. Chaplin" of the "insurance department" requested and was given the file on Florence; that even though no policy was issued, Florence was nevertheless covered under the assigned risk plan until the company gave notice of an intent to cancel; that he later refunded Florence $90, keeping $7 as an unearned premium.

*Count 5*

Defendant conceded that he received $123 as down payment of Jimmy Camp's premium. The total premium was $307. Camp, according to defendant, financed the balance at $33.73 per month for six months and that he made three payments to the financing institution. Defendant testified that he transmitted all money paid by Camp except defendant's commission. Later, Camp received a bill from the insurance company that $91.15 was due on the premium. Defendant testified that Camp became upset over this event; that Camp paid this amount as well as defendant. As a result, an overpayment was made. Camp later received a $90 refund from the company and a $30 refund from defendant.

*Count 6*

Defendant admitted receiving a $250 down payment from Mr. Greene. Greene's total premium was $422. The balance was to be financed by Acceptance Premium Company but defendant "had a disagreement" with this firm and he did not know whether the company would finance the balance of Greene's premium. In any event, Greene was also on the Georgia assigned risk plan and his insurance was placed with Georgia Farm Bureau Mutual Insurance Company in Macon. Defendant sent a $125 check payment to Georgia Farm Bureau in partial payment of Greene's premium. The check was returned unpaid marked "refer to maker" and Greene was advised of this event. Thereupon, defendant sent a cashier's check for $125 to Georgia Farm Bureau.

According to defendant, Greene became "upset" and requested that defendant cancel the policy. Defendant offered to make a refund to Greene but before he could accomplish the refund, Greene "had sworn out a warrant for me" and on the advice of counsel, he did not make the return of Greene's money as "I would be tampering with a State's witness or something of that nature." Nevertheless, at the time of trial, defendant admitted that he was indebted to Greene and he was willing to pay. *Held:*

Our theft by taking statute in effect at the time of these alleged thefts provided: "(a) A person commits theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of said property, regardless of the manner in which said property is taken or appropriated." Code § 26-1802 (a).

The state's case was based on the theory that defendant having been placed in lawful possession of money as a down payment by his respective customers, thereafter unlawfully appropriated these funds with the requisite intent to steal them. The Greer count charged the theft of $556.58. The proof shows that defendant only received $307 from either Greer or his mother. Defendant testified that he paid these funds to Allstate. There is nothing in the evidence from which a contrary conclusion can logically be found. All other funds expended by Greer or his mother were paid directly to either Allstate or the Premium Finance Company. While the evidence does show the payment of an amount of money far in excess of the $977 quoted premium, the record fails to show any explanation for this excessive payment. No evidence from either the insurer or the finance company was offered. This statement applies equally to all counts. The evidence fails to establish that defendant committed theft by taking money from Greer or his mother.

In the case of Bessie Bunkley, defendant was charged with the theft of $286.52. Two hundred dollars was the total amount given to defendant by Mrs. Bunkley. Defendant testified that he transmitted all money given him for premiums by Mrs. Bunkley to the two insurers involved in her insurance purchase, less his commission.

There is again no evidentiary basis which would authorize a jury to find a contrary conclusion. The retention of his commission was never shown to be unlawful.

By the same token, we find nothing in the evidence which would authorize the jury to return guilty verdicts as to the counts of the indictment pertaining to Camp or Florence.

Turning lastly to the Greene transaction, the evidence likewise will not authorize a guilty verdict. While the state's case shows defendant received a down payment of $250, and Greene received no policy and no refund, defendant's testimony gave an explanation of the difficulties encountered in the Greene transaction and that he was willing to repay Greene. Nothing was shown to contradict defendant. As to this count, and all others for that matter, the state's case was circumstantial. The facts and circumstances shown by the evidence, to include defendant's evidence, do not exclude every other reasonable hypothesis save that of the guilt of the defendant. Therefore, the jury's findings of guilty of all five counts were not authorized. Code § 38-109.

*Judgment reversed. Quillian, P. J., and Smith, J., concur.*

ARGUED MARCH 13, 1979 — DECIDED
APRIL 13, 1979.

*J. Roger Thompson, Frank J. Petrella,* for appellant.
*Lewis R. Slaton, District Attorney, Joseph J. Drolet, Benjamin H. Oehlert, III, Assistant District Attorneys,* for appellee.